Filed 7/1/21  In re A.C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.C. et al., Persons Coming Under the Juvenile Court Law. | B308315 |
| | (Los Angeles County Super. Ct. Nos. 20CCJP01814, 20CCJP01814 A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.C.,<br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Victor G. Viramontes, Judge.  Reversed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel,

Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

The juvenile court exercised jurisdiction over mother A.C.'s two children, 13-year-old A. and nine-year-old K., finding that mother had a substance abuse problem that placed the children at risk of harm. (Welf. & Inst. Code, § 300, subd. (b)(1).[1]) This finding was based on mother's admission of occasional drug use at the initiation of the case, and several missed drug tests thereafter. There was no evidence that mother was ever with her children while under the influence of drugs, or that her drug use affected her ability to care for the children. No evidence suggested that mother's drug use posed a risk that the children would suffer serious physical harm. The evidence was therefore insufficient to support the juvenile court's jurisdiction order, and we reverse. Because we reverse the jurisdiction order, we do not reach mother's contentions regarding the disposition order.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Non-detention

Thirteen-year-old A. and nine-year-old K. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on January 27, 2020 after a report to the child protective hotline stated that mother had been hospitalized "due to chest pressure and shortness of breath with polysubstance abuse." The report said that mother tested positive for methamphetamine upon admission, and mother admitted that she used methamphetamine recreationally once or

---

[1]All further statutory references are to the Welfare and Institutions Code.

twice a month.  Mother also stated that she uses marijuana to help her sleep.  Mother stated that nine-year-old K. lived with her, and 13-year-old A. lived with father.  The report stated that mother "never uses in the presence of the child," but that "she uses on occasion when she goes out with friends" and "the child" is with father or maternal grandmother.  The doctor spoke with mother about the negative effects of drugs on her health, and mother "indicated she no longer plans to use meth when she is released from the hospital."  The reporter did not know the gender of the nine-year-old or the names of the children.

A children's social worker (CSW) went to mother's home on January 30, 2020.  The studio apartment was maternal grandmother's home; mother and K. were staying there temporarily.  The CSW noted that the apartment was "a bit cluttered but all utilities were in working order and no safety concerns were noted."  Mother told the CSW that she had been hospitalized due to congestive heart failure and fluid buildup.  Mother admitted that she used methamphetamine "three times in the past year via snorting 'a little line,' with the last time being around 3 weeks ago.  Mother stated that she did not use any illicit drugs for 7 years prior to this past year, but did not go into further detail."  The detention report further stated, "Mother clarified that she never uses around her children and that it was only when she went out (out of town specifically) with friends while maternal grandmother or the father was taking care of the children."  Mother also stated that she used to smoke marijuana to help her sleep, but "she was quitting smoking cigarettes, including marijuana."  She agreed to submit to drug testing for DCFS.  Mother stated that she and father were in the process of divorcing, and father had been diagnosed with cancer.

3

The CSW spoke with K., who stated that she lives with mother and A. lives with father; K. visited father almost every weekend. K. denied any abuse or violence in mother's home, denied any drug use in the home, and was aware that her mother was recently hospitalized for "something in her heart . . . fluid in her lungs." K. said that sometimes mother's boyfriend, Sam, visits, and she described him as "good" and "nice." K. also said she was doing well in school and got As and Bs on her last report card.

Maternal grandmother reported that mother had been having heart problems, and mother had recently been in a car accident in which all the airbags deployed. Maternal grandmother cared for K. while mother was in the hospital. Maternal grandmother said mother was a very good mother who took care of her children, and she had no concerns about mother's boyfriend, Sam. She also said there was a family history of heart problems, and her middle daughter had been hospitalized for such issues two weeks earlier.

Mother's drug test on February 4, 2020 was positive for marijuana metabolites. From February 4 to February 21, 2020, the CSW had trouble contacting both mother and father, due to mother's phone not accepting calls or voicemails, and the CSW not having current contact information for father. On February 21, the CSW reached father and made arrangements to meet him and A.

The CSW met father and A. at father's home on February 24, 2020. The home was appropriately furnished with no noted safety hazards. A. said he was doing well in school, getting Bs and Cs in his classes, and doing martial arts after school. K. visited father's home every other weekend, and A. visited

4

mother's home less often because mother did not have as much space.  A. denied any knowledge of drug use by mother or father, and stated that mother does not drink alcohol.  A. denied any physical or sexual abuse, and reported feeling safe with both parents.

Father told the CSW that he was seeking full custody, but he had no concerns about mother's care of the children.  Father later clarified that his request for "full custody" was not intended to "take mother's rights away," but to have K. live with him and A.  The detention report stated, "Father stated that mother and the grandmother love the children very much and that he is certain they would do everything they can to protect them and make sure they're safe."  Father said he had been in remission from cancer, but he learned recently that it had returned.  Father was unaware of any drug use by mother.

On February 24, 2020, the CSW spoke with mother again. Mother stated that she had been sick with the flu and her phone has been turned off "due to being unable to pay for service."  The CSW asked mother to drug test again, but mother asked why she needed to continue testing, and noted that she did not have a car due to the recent car accident.  The detention report stated, "Mother appeared to become a little defensive about the allegations and asked about the allegations again.  Mother stated that she is a good mom and that the kids are well taken care of. Mother stated that she is struggling to make ends meet right now but can't comprehend why there is a concern for the welfare of her children."  The CSW discussed the hotline referral and stated that DCFS takes allegations regarding methamphetamine seriously, and mother agreed that it is a "hard drug."

Mother agreed to drug test the following day.  When she went to the testing center, she discovered that she did not have her identification with her, and the center refused to allow her to test.  The center gave mother documentation showing that she had been at the center.

The CSW met with mother and K. again at their home on February 26, 2020.  K. said she recently visited father, and she was recovering from the flu and an allergic reaction to food.  According to the detention report, K. "did not report any worries at this time."  Mother reported that she had been a delivery driver when she was in the car accident, and she was upset that without a car, she could no longer work.  Mother told the CSW she was not using any drugs.

The CSW asked mother if she would agree to enter a drug program. Mother "appeared to get emotional" and said that her earlier "mistake" occurred while her children were not under her care.  Mother asked who made allegations that the children were at risk, and the CSW told mother that the identity of the reporter was confidential.  The CSW told mother that DCFS planned to seek jurisdiction in juvenile court, and told mother to be honest about her drug use.  Mother estimated that she had used methamphetamine "maybe twice?  In the past year?"  Mother also told the CSW that she had been a patient of a methadone clinic three years earlier after becoming dependent on prescription medication following "a terrible accident."  Mother said her treatment lasted about a year.  Mother agreed to participate in programs for DCFS because "her children are everything to her and she will do whatever she needs to do."  Mother provided the CSW with her email address and maternal grandmother's phone

number to provide alternate means of contacting her in case her phone was disconnected again.

K.'s school reported to DCFS that K. did not have any academic or behavior problems. However, K. "has attendance issues as she has 45 tardies and 17 days of absences." The principal did not have any concerns regarding abuse or neglect. A. did not have attendance issues, but he did have academic and behavior problems. His report card showed grades of B and D, and he had been disciplined for possession of marijuana and attempting to cause physical injury. Information from both schools is written in the detention report; no documents from either school are included in the record.

The CSW visited the children at father's home on March 19, 2020, and noted no concerns. A. said he had been doing his schoolwork and completing online lessons from home.[2] K. said that she had been completing workbook lessons, and that her school had some online lessons that were not mandatory. Father stated that after "some soul searching," he had decided that he wanted joint physical custody of the children. Father reported no concerns about mother.

The CSW noted multiple instances in which she attempted unsuccessfully to reach mother and father. The CSW went to mother's home on March 26 and found mother and both children there. The children "cheerfully greeted" the CSW. The CSW told mother it was important to remain in touch, and gave her information about free or discounted phones. Mother said she would look into it.

---

[2]We note that around this time, schools were limiting or halting in-person classes due to the Covid-19 pandemic.

The CSW told mother that DCFS would not recommend that the children be detained, but would seek family maintenance services "to ensure that mother maintains her sobriety and follows through with services." Mother responded that she did not understand why court supervision was required when the children were not experiencing any problems. The CSW "reminded mother again about the risks of mother's substance abuse and history."

The detention report noted that the family had no DCFS history and mother had no criminal background. DCFS stated that "the child is at risk of abuse and/or neglect by the mother," because "the Department has concerns regarding mother testing positive for methamphetamines at admission" to the hospital. It further stated, "Mother disclosed to hospital staff using methamphetamines approximately 1 to 2 times per month, but minimized her use to CSW upon questioning." DCFS also noted mother's past prescription drug dependency. DCFS requested family maintenance services "to prevent the need for removal from mother and mitigate the risk to the children."

On March 30, 2020, DCFS filed a juvenile dependency petition under section 300, subdivision (b)(1). The single count alleged that mother "has a history of substance abuse including prescription medication and is a current abuser of methamphetamine and marijuana which renders the mother incapable of providing regular care for the children. On prior occasions, the mother was under the influence of marijuana while the children were in mother [*sic*] care and supervision. On 02/04/2020, the mother had a positive toxicology screen for marijuana. The mother's substance abuse endangers the children's physical health and safety, and places the children at

risk of serious physical harm and damage." DCFS asked that the children remain non-detained in the home of parents, and that mother be ordered to complete a substance abuse rehabilitation program with random drug and alcohol screening, individual counseling, a psychological evaluation, and parenting education. DCFS also recommended individual counseling and parenting education for father, and individual counseling for the children.

At the detention hearing on April 2, 2020, mother, through counsel, denied the allegations. The court found that a prima facie showing had been made that the children were persons described by section 300. The court ordered that DCFS "make[ ] testing available to mother," and the children would remain released to parents as long as mother had "no unexcused missed tests and no dirty tests." The court stated that "a low level of marijuana consistent with medicinal use" would be acceptable.

## B.    Detention

A detention report dated July 10, 2020 stated that DCFS "has concerns for the safety of the child [*sic*] in the home of mother . . . due to mother's ongoing failure to submit to drug and alcohol testing. [Mother] failed to provide a specimen on the following dates: 2/25/2020, 5/26/2020, 6/1/2020, 6/18/2020, 6/19/2020, and on 6/25/2020." Another portion of the detention report noted that mother's drug test on May 13 was positive for marijuana. The CSW stated that she unsuccessfully tried to contact mother on April 21; May 4, 5, and 8; and June 19, 22, 23, 24, and 25. The CSW scheduled a visit with mother for May 18, and mother rescheduled twice to May 20. Information about a home visit with mother on May 20 (or any other date) is not included in the detention report. A separate entry stated that

9

mother "does not make herself available for home visits to meet with" the CSW.

The CSW called father on April 21, 2020. Father stated that he had just dropped the children off with mother that morning. Father "stated that he has hired an attorney and that he is concerned about the children's well-being now that he has found out about mother's drug use. Per [father], he was unaware that the mother was using drugs and stated, 'She never gave me any indications that she was a user.'" In a text message on May 4, father told the CSW that he was concerned about the children's safety "now that he's found out about 'mother's drug use,'" which he said he "'found out by reading the court report.'"

The CSW met with father and the children at father's home on June 25, 2020. Father stated that he had hired a private attorney and was seeking full custody of the children in the divorce. Father stated that mother "makes no efforts to better her life in anyway [*sic*], no NA, no AA, dependency programs, not looking for employment when there are 1000 of [*sic*] opportunities out there. [Father] stated that [mother's] stability is non-existent and [father] does not feel comfortable anymore [*sic*] with the environment that the kids live in with [mother]." Father's treatment for cancer was continuing.

The CSW spoke with A., who stated that he recently returned from a week at mother's house. A. said that mother was "pretty cool," and he had no worries about her. A. said that mother had texted him the day before. K. stated that their week with mother was good, but she was upset with mother "for lying about braking [*sic*] up with Sam, when in reality they are still together." K. said that mother had not responded to her calls since June 20. K. said she did not have any concerns about

10

mother, except that she wanted mother to answer her calls and not lie about Sam.

DCFS stated in the detention report that one of its concerns was that "Mother has not made herself readily available to DCFS during the initial investigation and since the Detention hearing." The detention report also stated, "Since COVID-19 and online learning was initiated on March 13, 2020, [K.'s] school has not been able to reach [K.] or her family. The school reported making multiple attempts to reach the family and sent her name to the Pupil Services office who was unable to make contact. The school reported that phone numbers they have for the family do not work and they believe that the family has challenges, (i.e. parents are ill, father has cancer and mother may have medical issues)." The date DCFS received this information is not stated, no school records are included with the report, and the report does not indicate that the CSW asked K. or any other family members about school attendance.

The detention report stated that when the CSW served mother with "the warrant," mother said she did not understand because the children were fine and had everything they need. Mother said there was a lot going on with the pandemic, she lost a close friend, the family business had been lost, her family was in the process of moving, and her family was facing financial hardships. DCFS stated that mother "minimizes her substance abuse and despite a large support network, she keeps her use hidden from the rest of the family under the guise of medical conditions and thus has no external accountability. Mother has not made herself consistently available to the department for testing, and as such it was determined that court orders are needed to ensure the safety and wellbeing of the children."

11

On July 14, 2020, DCFS filed an ex parte application under section 385, seeking to detain the children from mother and release them to father. DCFS stated that it was concerned about mother's many missed drug tests. Mother told the CSW that she forgets to call the testing site daily due to her long working hours, losing the family business, and looking for a place to live. Mother agreed to test on June 18, but when she went to the testing site she found that it was closed. In fact, the test was scheduled for June 19. Mother did not return to the testing site the following day. The application repeated much of the information from the July 10, 2020 detention report.

At the hearing on the section 385 petition on July 14, 2020, counsel for the children requested a self-executing order releasing the children to mother after four consecutive acceptable drug tests. Counsel for the children noted that "no one has alleged any unsafe behaviors" by mother, there was "a lot of family support," and the children wanted to continue spending time with mother. Mother's counsel asked that the children be released to mother. Mother's counsel also noted that mother tested negative on June 30, and explained that the CSW's difficulties reaching mother arose from mother traveling to a friend's funeral and mother's lack of a working phone. Mother's counsel also noted the lack of any allegations of unsafe behavior involving the children. Father's counsel stated that father was "concerned that the children are being upended by mother's behavior, ongoing use of substances."

Counsel for DCFS argued that the court already conditionally released the children to mother, and "the court was very clear in April that mother was not to have any missed tests." Counsel for DCFS also argued that mother made no efforts to

contact the CSW, and questioned whether mother would continue to follow court orders. DCFS therefore requested that the court not implement a self-executing order based on four clean tests.

The juvenile court detained the children from mother and released them to father. The court also issued "a self-executing order that if the mother tests clean for all substances other than marijuana, then the detention is – would be removed and the children would be released back to the care of the mother." Mother stated that she understood, and her previous missed tests and lack of communication "wasn't intentional." She said she had "never been through anything remotely close to this," did not know she was supposed to stay in touch with the social worker, and would do "whatever necessary. . . for my kids." The court stated that having the children continue to reside in mother's home was contrary to the children's welfare. The court ordered unmonitored visitation for mother within maternal grandmother's home, and monitored visitation elsewhere.

## C. Jurisdiction

A jurisdiction/disposition report filed September 10, 2020 (erroneously dated May 18, 2020) stated that the children remained with father. After the July 14 hearing, mother had negative drug tests on July 30, August 3, August 19, and August 24. Mother had no-show tests on July 15, July 20 and August 11.

On July 24, the CSW spoke with mother about the missed test on July 20. Mother stated, "That was Monday when we spoke. Ughhhhh. Ok, so I completely understand now what need[s] to be done on my end." Mother said it would not happen again, and told the CSW that she was making arrangements to leave work to drug test as needed. On August 12, mother called the CSW and stated that the day before, August 11, she arrived

13

at the testing site before it closed, but they would not allow her to test because "she did not make the testing cut off." Mother asked if she could test "on demand" that day, but the supervising CSW "stated that [mother] will not be testing on demand due to already being informed of the importance of arriving to the testing site early rather than near closing time." The CSW told mother on August 20 that because she missed the test on August 11, she must complete four more consecutive clean tests before the children could be released to her. Mother later stated at the jurisdiction hearing that she believed the August 11 no-show had been excused. Mother had not yet enrolled in any counseling services (which had not been ordered by the court), and DCFS stated that mother "still has not enrolled in any DCFS recommended programs."

When interviewed on July 20, 2020, K. said that everything was going "okay" and she was waiting to find out what mother's regular visitation days and times would be. K. said that mother was communicating with her. A. reported that things were okay, but he was reluctant to speak with the CSW. Father repeated his concerns that mother was not enrolled in a drug program and was not making efforts to improve her life or look for work. In another interview on August 27, father told a dependency investigator that he was not happy with how DCFS handled the case. The report did not elaborate about father's concerns. On August 25, 2020, the director of the family preservation services program informed the CSW that she was terminating family preservation services because despite "many attempts to complete and/or schedule meetings with the father," no intake had ever been completed. The dependency investigator noted

14

difficulty in reaching mother, father, and K. on their respective phones.

DCFS stated that its concerns regarding the family included that mother "is a current abuser of methamphetamines and marijuana," and she "has not been participating in random drug/alcohol testing on a consistent basis." It noted concerns about K.'s lack of attendance at school, but referenced information from the previous school year, and did not include any information about the school year currently in progress. It also stated concern that "mother and maternal grandmother reside together and maternal grandmother denied knowledge of mother's substance abuse issues." DCFS recommended that the court sustain the petition, order that the children remain detained from mother, order monitored visitation for mother, and provide family maintenance services for father.

A last-minute report dated October 21, 2020 stated that mother had no-show drug tests on September 16, 24, and 30. Mother had not yet enrolled in any DCFS-recommended programs. Father expressed concerns that mother was not being "held accountable" and that DCFS was not doing enough to monitor mother's sobriety. DCFS stated that "Mother lacks insight into how her ongoing substance abuse issues negligently impact her children's physical and emotional health and safety. The children want a relationship with their mother, but due to mother's ongoing substance abuse issues, it is not safe for the children to have unsupervised contact with their mother." DCFS stated that father has provided a safe home for the children, and recommended that the petition be sustained, and jurisdiction terminated with a family law order awarding father sole legal and physical custody.

15

At the jurisdiction and disposition hearing on October 21, 2020, the court received the DCFS reports as evidence; no witnesses testified. The children's counsel asked that the petition be dismissed, because DCFS failed to meet its burden to show that there was a nexus between any drug use and a risk of harm to the children. The children's counsel also noted that school absences did not constitute a risk of serious physical harm.

Mother's counsel joined the children's argument. Mother's counsel also pointed out that although K. had some attendance issues at school, she was doing well academically, and school absences were not a sufficient legal basis for jurisdiction. Mother's counsel stated that mother had no tests showing methamphetamine use after her hospitalization. She explained that mother had misunderstood the court's July 14 order regarding four consecutive clean drug tests. Mother believed that she had five acceptable tests—July 30, August 3, August 19, and August 24, plus what she believed was an excused test on August 11. She believed she had satisfied the court's requirements, and did not know she was supposed to continue testing after those clean tests, resulting in the additional missed tests in September.

Father's counsel asked that the petition be sustained, asserting that "but for father being around and being present and being cooperative, these children would still be in foster care [*sic*]." Father's counsel also stated that the "lack of schooling" was a risk factor.

Counsel for DCFS also argued that the petition should be sustained, asserting that methamphetamine use was "inherently dangerous" because "[t]here are all kinds of problems that come along with that kind of abuse." Counsel for DCFS argued that the court was clear that mother needed four clean drug tests,

16

"Yet she couldn't manage to pull off four clean tests," which "really suggests that somebody has a serious problem." In addition, counsel for DCFS asserted that K.'s attendance issues "definitely points toward a problem with drug use."

The court found that DCFS met its burden, and the children were persons described by section 300, subdivision (b). The court noted that "there is a history of substance abuse that remains ongoing," stating that it was "placing weight on the statements that the mother made when she was in the hospital" when she "admitted to continuing methamphetamine use." The court also noted that mother tested positive for marijuana. Along with the missed tests, the evidence was "sufficient for the court to conclude that the mother still has a substance abuse problem." Although mother said she did not use drugs while with the children, "there's this problem that the kids were missing school. And so it looks like the mother's substance abuse problems were affecting her ability to parent."

Turning to disposition, the children's counsel stated, "I'm of the opinion that there's no risk in this case," and asked the court to terminate jurisdiction with an order for joint custody. The children's counsel noted that mother and maternal grandmother recently bought a home together, having maternal grandmother in the home provided an adequate safety plan for the children, and both A. and K. "expressed they wanted as much access to both of their parents as possible." The children's counsel stated that the "eventual priority" for both children was "to have joint custody with both of their parents."

Father asked that mother's visitation with the children be monitored because "he's not confident that she's sober at this point." Father asked that someone other than maternal

grandmother monitor the visits, because "maternal grandmother has not shown any indication that she knows when the mother is under the influence of drugs."

Mother's counsel also asked that the court terminate jurisdiction with joint physical and legal custody. Mother's counsel noted that maternal grandmother did not recognize mother's drug use because mother only used substances when outside of the home and away from the family.

Counsel for DCFS argued that mother had not been following court orders throughout the duration of the case, and giving mother overnight visits would be "too soon, considering her lack of any kind of compliance."

The court kept the case open, and found by clear and convincing evidence that there would be a substantial danger to the children if not removed from mother's custody "based on what I've determined to be ongoing substance abuse problems." The court granted mother weekly overnight visitation "on the condition that the mother live with the maternal grandmother," and ordered additional unmonitored visitation. Mother timely appealed.

## DISCUSSION

Mother asserts that the court's jurisdiction and disposition findings were not supported by substantial evidence. She contends there was insufficient evidence of substance abuse or any substantial risk of serious physical harm to the children. She also asserts that the court's disposition order was not supported by the evidence. We agree that the court's jurisdiction finding was not supported by substantial evidence, and therefore do not address her contentions regarding disposition.

18

"Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse.' (§ 300, subd. (b)(1).)" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) "A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*Ibid.*)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Evidence is substantial if it is reasonable, credible and of solid value. (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*Ibid.*)

California Courts of Appeal have made clear for more than a decade that a parent's drug use, without more, cannot support a finding of juvenile court jurisdiction. (See, e.g., *In re Alexis E.* (2009) 171 Cal.App.4th 438, 453 ["use of medical marijuana,

19

*without more*, cannot support a jurisdiction finding that such use brings the minors within the jurisdiction of the dependency court"]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 764 ["without more, the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found']; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 ["It is undisputed that a parent's use of marijuana 'without more,' does not bring a minor within the jurisdiction of the dependency court. [Citation.] The same is true with respect to the use of hard drugs."]; *In re L.W.*, *supra*, 32 Cal.App.5th at p. 849 ["drug use or substance abuse, without more, is an insufficient ground to assert jurisdiction in dependency proceedings under section 300"]; *In re L.C.* (2019) 38 Cal.App.5th 646, 654 [a father's "'use of methamphetamine, without more, cannot' support jurisdiction"]; *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451 ["Father's use of methamphetamine, without more, cannot bring the children within the jurisdiction of the dependency court"], disapproved of on another basis by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 7.)

"The law is clear that jurisdiction must be based on substance *abuse*; mere substance *use* is not sufficient for jurisdiction." (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.) Substance abuse involves a "'maladaptive pattern'" of behavior manifested by "'(1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; ¶] (2) recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when

20

impaired by substance use)[; ¶] (3) recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)[; and ¶] (4) continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights).' (DSM–IV–TR, at p. 199.)" (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766.) Although this "is not a comprehensive, exclusive definition" for substance abuse (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218), where there is "a lack of evidence of life-impacting effects of drug use," there is insufficient evidence to "support a finding that a parent has a substance abuse problem justifying the intervention of the dependency court." (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 726.)

Mother's actions do not fit this framework. Mother's substance use was not clearly impacting her daily life—maternal grandmother, father, A. and K. had no suspicions that mother used drugs before DCFS's involvement. The record suggests that Mother's hospitalization was caused by her heart condition, not drug use. Neither maternal grandmother nor father had any concerns about mother's care for the children before DCFS became involved. No evidence suggested that mother ever used methamphetamine or marijuana while caring for the children, and mother stated that she only used methamphetamine while she was out of town and away from the children, and mother never tested positive for methamphetamine. The children made clear that they wanted their parents to share custody, and they had no concerns about being with mother. The evidence does not demonstrate the "life-impacting effects of drug use."

21

Even if we were to assume that mother had a substance abuse problem, however, a jurisdiction finding under section 300, subdivision (b)(1) "requires a showing of a risk of serious physical harm resulting from [a parent's] substance abuse." (*In re Destiny S.*, *supra*, 210 Cal.App.4th at p. 1005.) No such evidence existed here.

DCFS argues on appeal—in a total of three sentences in the argument section of its brief—that K. had many school absences and tardies, and A. had behavior problems. Nothing in the record connects these issues to mother's drug use. There is no indication in the record that DCFS ever asked the parents, the children, or maternal grandmother about these issues. In spite of her absences, K. continued to do well academically. DCFS apparently never followed up with the school after July; even though the case began in January 2020 and the court made a jurisdiction finding in October 2020, there is no information about whether either child enrolled in school for the 2020-2021 school year, or whether the children advanced to the next grade.

As mother's and the children's counsel correctly noted at the jurisdiction hearing, school absences, without more, cannot support a finding of jurisdiction under section 300, subdivision (b)(1). "It is also no doubt true failing to go to school regularly is very detrimental to the children. Failing to attend school regularly not only deprives the children of an education, but also of the social interaction and 'peer relationships necessary for normal growth and development.'" (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388.) "However, that is not the same as saying the failure to attend school created a 'substantial risk' of suffering 'serious physical harm or illness.' The lack of education may well cause psychic or emotional or financial or social harm.

But there are no facts alleged, or suggested by the supporting documentary evidence, to indicate mother's failure to ensure the children's regular school attendance subjected the children to physical injury or illness, serious or otherwise." (*Id*. at pp. 388-389; see also *In re Destiny S.*, *supra*, 210 Cal.App.4th at p. 1003 [Even assuming that mother's "drug use 'could' have been the cause of Destiny being late to class," that "conclusion is irrelevant to dependency jurisdiction" where there is no substantial risk of serious physical harm].)

Noting that A. was found to possess marijuana at school in October 2019, DCFS argues that "Mother's drug abuse appears to have made it difficult for her to set a good example to [A.] as to how to become a responsible adult." It is not the case that any time a teenager gets in trouble at school, the child's mother must have failed to "set a good example." In addition, the evidence makes clear that no family member even knew mother used drugs before DCFS became involved with the family. DCFS's contention that A. was mimicking mother's behavior months before the case began is wholly unsupported by evidence.

Here, both DCFS and the juvenile court took a position our colleagues in Division Eight of this court rejected in *In re Rebecca C.*, *supra*, 228 Cal.App.4th at p. 728: "DCFS essentially argues that, when a parent engages in substance abuse, dependency court jurisdiction is proper. This is not what the dependency law provides. Further, if DCFS's position were accepted, it would essentially mean that physical harm to a child is *presumed* from a parent's substance abuse under the dependency statutes, and

23

that it is a parent's burden to prove a negative, i.e., the *absence* of harm.  Again, this is not what the dependency law provides."[3]

There is no question that during the pendency of this case, mother was unreliable, difficult to contact, and missed many drug tests.  But the evidence also showed that mother's life was in upheaval—she and father were divorcing, she had recently been in a serious car accident, she had been hospitalized for heart problems, she moved in with maternal grandmother and then they moved to a new home, there was a global pandemic, schools had closed, maternal grandmother lost her business, and one of mother's close friends passed away.  The juvenile dependency system does not allow a court to exercise jurisdiction over a child simply because the parent is unreliable, however; "[t]he overarching goal of dependency proceedings is to safeguard the welfare of California's children."  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)  That purpose is not served by exercising jurisdiction in the absence of a substantial risk that a child will suffer serious physical harm.

---

[3] Although such a presumption may be appropriate in a case involving children of tender years (see, e.g., *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 767), it is not applicable here, where K. was nine years old and A. was 13 years old when the case was initiated.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.

25